IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DODSON INTERNATIONAL PARTS, INC.,

     Plaintiff,

     v.                              Case No. 16-CV-2212-JAR

WILLIAMS INTERNATIONAL CO., LLC,

     Defendant.

## MEMORANDUM AND ORDER

Plaintiff Dodson International Parts, Inc. ("Dodson") filed this suit against Williams International Co., LLC ("Williams") alleging state law claims for intentional misrepresentation, breach of bailment and conversion, and tortious interference with prospective economic advantage and contract, and declaratory judgment, and federal claims for violation of the Sherman Act[1] and the Clayton Act.[2]  These claims stem from an aircraft purchase, including two engines manufactured by Williams, and a subsequent contract for Williams to inspect and repair the engines for Dodson.  Plaintiff alleges that Williams wrongfully refused to repair the two jet engines and authorize them for future use as Dodson intended to resell them.  This matter is before the Court on Williams's Motion to Stay Litigation and Motion to Compel Arbitration (Doc. 10).  The motion is fully briefed, and the Court is prepared to rule.  For the reasons set forth below, the Court grants Williams's motion to compel arbitration.

---

[1] 15 U.S.C. §§ 1–2.

[2] 15 U.S.C. § 3.

## I.     Legal Standard

It is undisputed that this case is governed by the Federal Arbitration Act ("FAA").

Section 2 of the FAA, which is the primary substantive provision,[3] provides in pertinent part that

> [a] written provision in any maritime transaction or a contract evidencing a
> transaction involving commerce to settle by arbitration a controversy thereafter
> arising out of such contract or transaction . . . shall be valid, irrevocable, and
> enforceable, save upon such grounds as exist at law or in equity for the revocation
> of any contract.[4]

The Supreme Court has described § 2 as reflecting "both a liberal federal policy favoring

arbitration and the fundamental principle that arbitration is a matter of contract."[5]  The FAA

reversed a longstanding judicial hostility to arbitration, favoring a presumption of arbitrability if

an agreement requires arbitration.[6]  "If a contract contains an arbitration clause, a presumption of

arbitrability arises, particularly if the clause in question contains . . . broad and sweeping

language."[7]  Any doubts concerning arbitrability of a dispute should be resolved in favor of

arbitration.[8]

However, the presumption of arbitrability disappears when the parties dispute whether

there is a valid and enforceable arbitration agreement in the first place.[9]  Whether a party agreed

to arbitration is a contract issue, which means that arbitration clauses are only valid if the parties

---

[3] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

[4] 9 U.S.C. § 2.

[5] *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations and internal quotation marks omitted).

[6] *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).

[7] *ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995); *see also Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 613 (10th Cir. 2014).

[8] *LDS, Inc. v. Metro Can. Logistics, Inc.*, 28 F. Supp. 2d 1297, 1299 (D. Kan. 1998).

[9] *Bellman*, 563 F. App'x at 613 (citing *Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir. 2002); *Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir.1998)).

intended to arbitrate.[10]  No party can be compelled to submit a dispute to arbitration without having previously agreed to so submit.[11]  Courts apply state-law principles in deciding whether parties agreed to arbitrate.[12]  Here, neither party disputes that Kansas contract law applies.[13]

      "Summary-judgment-like motions practice may be a permissible and expedient way to resolve arbitrability questions when it's clear no material disputes of fact exist and only legal questions remain."[14]  The Court will "decide the arbitration question as a matter of law through motions practice and viewing the facts in the light most favorable to the party opposing arbitration."[15]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[16]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[17]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[18]

---

[10] *Ragab v. Howard*, No. 15-1444, 2016 WL 6832870, at *2 (10th Cir. Nov. 21, 2016) (citing *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

[11] *Id.*

[12] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[13] *See* Doc. 14 at 9; Doc. 18 at 1.

[14] *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 984 (10th Cir. 2014).

[15] *Id.* at 978 (citation omitted); *see also Patrick Higgins & Co. v. Brooke Corp.*, No. 06-4111-JAR, 2007 WL 2317123, at *1 n.2 (D. Kan. Aug. 9, 2007) (citing *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1116 (D. Kan. 2003) (stating that in the context of motions to compel arbitration, courts should apply a standard similar to that applicable in a summary judgment motion)).

[16] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[17] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[18] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## II.     Facts

Both parties submitted comprehensive recitations of the facts.  Many of the facts submitted relate to the underlying claims rather than this motion.[19]  The Court includes only the facts relevant to the motion to compel arbitration.

Dodson was formed in 1984 and is engaged in the business of purchasing airworthy or unairworthy aircraft, aircraft engines, and parts for operation, restoration, repairs, disassembly, inspection, and resale.  Such purchases and resales take place throughout the world.  Williams has manufactured and sold FJ44 engines for more than twenty years.  Since that time, Williams has maintained FAA-approved maintenance, repair and overhaul manuals for the several series of FJ44 engines.

In October 2013, Dodson purchased a Cessna jet with two engines manufactured by Williams following a landing accident in Brazil.[20]  Dodson intended to sell the jet once repaired. On February 19, 2014, Dodson contacted Williams to request a determination as to airworthiness for the two engines and for an estimate of the cost of returning the engines to service.  Dodson contacted Williams only because Williams wholly owned FAA Certified Part 145 Repair Station is the only repair facility with Williams-supplied technical information necessary to perform the test cell runs, engine disassembly if necessary, parts inspection and reassembly.[21]  Williams

---

[19] The Court sustains Williams's objection to the transcript of the FAA presentation as inadmissible hearsay that is not subject to any exception.  Fed. R. Evid. 801.  The FAA presentation was not considered by the Court in deciding this motion.  Also, many of Williams's objections to the declarations submitted by Dodson were facts not relevant to deciding this motion.  Doc. 18 at 3 n.2.  The Court did not consider Dodson's declaration ¶¶ 5, 7, 30, so it does not rule on these objections.  Also, the Court did not consider Cann's declaration ¶ 2, so it does not rule on this objection either.

[20] The engines have serial numbers ESN 141386 and 141387.

[21] Doc. 14-1 ¶ 15.  The Court overrules Williams's objection that this is an impermissible legal conclusion that J.R. Dodson, the sole owner and chief operating officer of Dodson, is not competent to assert.  Mr. Dodson was a chief decision maker in the business and is testifying from his personal knowledge why Williams was approached to make the repairs.

quoted Dodson $9525 per engine for inspection and to provide an estimate of repair costs to return them to an airworthy condition.

Dodson signed two contracts authorizing the evaluation and repair estimates on the engines on March 7, 2014. Both contracts contained identical arbitration and venue provisions. The clauses read:

> All disputes arising from or in connection with maintenance performed by Williams International shall be submitted to binding arbitration held in the County of Oakland, State of Michigan, U.S.A., in the English language in accordance with the rules of the American Arbitration Association. Williams International will designate the arbitration site.[22]

On April 3, 2014, Williams completed the evaluation and repair estimates for each engine. It estimated the repair for both engines at about $640,000. Williams emailed Dodson the estimate for each engine. On May 20, 2014, Dodson elected not to have Williams perform work on either engine per the estimate, and Dodson directed Williams to return the engines in a disassembled state. Williams stated it would not return the engines in a disassembled state, and it would only return them after they were reassembled as unairworthy to ensure that the parts were never installed on an aircraft.

During August 2014, Dodson advised Williams that it was reconsidering the repair and return to service of the engines pursuant to the April 2014 estimate. Dodson inquired about using serviceable parts for one engine to repair the other. On December 3, 2014, Williams told Dodson that it would be possible to use parts for one engine to repair the other. On January 9, 2015, Williams provided a new repair estimate for the one engine taking parts from the other, which was estimated at $248,805.99.

---

[22] Doc. 10-1 at 8, 10.

On February 10, 2015, Williams informed Dodson that the full authority digital engine controls ("FADECs") were exposed to unknown forces during the crash and were not repairable. The required additional hardware to make the engine airworthy added cost of more than $500,000.  In March 2015, Williams determined the engines were not flightworthy and could not be returned to service at any cost.  Williams told Dodson it would red tag the parts as unairworthy and return them to Dodson.

Williams shipped one of the engines to a third party outside of this matter.  Dodson allegedly has failed to pay $3000 to Williams, so the other engine remains at Williams's facility in Michigan.  Williams still has the FADECs from both engines.  Williams has never produced any parts evaluation criteria or reports concerning the precise condition that it claims renders the parts for the engine unserviceable.  Williams claims that it possesses the instructions for continued airworthiness ("ICA"), but it has not made the information available to Dodson.

## III.  Discussion

### A.  Validity and Enforceability of the Contracts

Dodson's first argument against compelling arbitration is that the contracts containing the arbitration clause are not enforceable based on contract defenses.  The final phrase of § 2 of the FAA permits arbitration agreements to be declared unenforceable "upon such grounds as exists at law or in equity for the revocation of any contract."[23]  This savings clause permits agreements to arbitrate to be invalidated by "generally applicable contract defense, such as fraud, duress, or unconscionability."[24]  Specifically, Dodson argues that it was fraudulently induced to enter into

---

[23] 9 U.S.C. § 2.

[24] *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations and internal quotation marks omitted).

the contracts, and the contracts are unconscionable.  The Court will address each argument in turn.

### 1.      Fraud in the Inducement

Dodson argues that it was fraudulently induced to enter into the contracts containing the arbitration clauses, and at a minimum, it was induced by "fraud by silence."  Specifically, Dodson argues that it would not have signed the contract if (1) Williams advised Dodson that it would be required to comply with service bulletins, (2) serviceability of parts would be determined without making criteria and reports available to Dodson, and (3) component parts of the engines, whether serviceable or unserviceable, would not be returned to Dodson if it did not authorize further work on the engines.  As the Court understands it, Dodson is asserting that the entire contract, not just the arbitration clause, was fraudulently induced and invalid.

In response, Williams argues that fraudulent inducement may not be considered by this Court, and the Court must submit any claim of fraudulent inducement to arbitration.  Dodson contends that the contract does not contain language that the question of arbitrability is to be determined by an arbitrator, so the issue should be decided by this Court.

Challenges to the validity of arbitration agreements "upon such grounds as exist at law or in equity" for the revocation of the contract come in two types.  The first challenges the validity of the agreement to arbitrate.[25]  The second challenges "the contract as a whole, either on the ground that directly affects the entire agreement, or on the ground that the illegality of one of the contract's provision renders the whole contract invalid."[26]

---

[25] *See, e.g.*, *Southland Corp. v. Keating,* 465 U.S. 1, 4–5 (1984) (challenging the agreement to arbitrate as void under California law insofar as it purported to cover claims brought under the state Franchise Investment Law).

[26] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006).

As a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.[27]  The Supreme Court announced in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*[28] that a claim of fraud in the inducement that goes to the validity of the entire contract should be decided by the arbitrator.[29]  Courts should only decide the issue if the defense goes to the arbitration clause alone.[30]  "A plaintiff seeking to avoid a choice provision on a fraud theory must, within the confines of Fed.R.Civ.P. 9(b) and 11, plead fraud going to the specific provision."[31]

Here, Plaintiff's challenge to the validity of the arbitration agreement is of the second type—the contract as a whole was fraudulently induced.  Plaintiff does not specifically allege it was fraudulently induced to enter the clause stating "[a]ll disputes arising from or in connection with maintenance performed by Williams International shall be submitted to binding arbitration."  Plaintiff does not plead that the arbitration clause was induced by fraud.[32]  Plaintiff does state

---

[27] *Id.*

[28] 388 U.S. 395 (1967)

[29] *Id.* at 403–04 (holding under § 4 of the FAA that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally" (internal quotation marks and footnote omitted)); *Buckeye Check Cashing, Inc.*, 546 U.S. at 448–49 ("[R]egardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator"); *Locke-O'Dell v. Global Client Sols., LLC*, No. 12-2009, 2012 WL 1033624, at *4 (D. Kan. Mar. 27, 2012).

[30] *Prima Paint Corp.*, 388 U.S. at  403–04; *see also Buckeye Check Cashing, Inc.*, 546 U.S. at 445–46 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance"); *Brooke Credit Corp. v. Buckeye Ins. Ctr.*, 563 F. Supp. 2d 1205, 1208 (D. Kan. 2008).

[31] *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 960 (10th Cir. 1992).

[32] The Court notes that Dodson's Complaint alleges intentional misrepresentation that led to entry into the contract.  However, the allegations are about the contract generally.  Dodson never pleaded that the specific arbitration provision was obtained by fraud.  *See* Doc. 1 ¶ 54 ("In reasonable reliance upon the false representations, a [Dodson] employee, not authorized to enter into substantive contracts for [Dodson], signed the boilerplate Williams International quotation form, caused the two engines to be shipped to Michigan for teardown and inspection and caused the advance teardown/inspection fee to be paid.").

that "[a]t minimum, the *arbitration* provision was induced by 'fraud by silence.'"[33]  However, directly following that statement, Plaintiff proceeded to list reasons that the contract as a whole is invalid for fraud by silence, including failing to advise Plaintiff that it would be required to comply with service bulletins, that serviceability of parts would be determined without criteria and reports, and that component parts of the engine would not be returned.  Plaintiff has produced no evidence tending to show that the arbitration provision alone was the product of fraud.  Instead, Plaintiff alleges it would not have entered into the contract, in its entirety, had it known about the above claims.

Next, the Court must address Dodson's argument that the issue of arbitrability was not delegated to an arbitrator.  Many contracts containing an arbitration clause also contain a clause that delegates disputes of arbitrability to arbitrators.[34]  The Supreme Court has held that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."[35]  However, the Supreme Court has clarified that the "clear and unmistakable" requirement pertains to the parties' manifestation of intent, not the agreement's validity.[36]  Thus, unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.[37]  The validity of the agreement to arbitrate (i.e. whether it was fraudulently induced)

---

[33] Doc. 14 at 14 (emphasis added).

[34] *See, e.g.*, *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 65 (2010) (containing a clause stating "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable.").

[35] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[36] *Rent-A-Center, West, Inc.*, 561 U.S. at 69 n.1.

[37] *Id.*; *see also Spahr v. Secco*, 330 F.3d 1266, 1270 (10th Cir. 2003) ("On this authority, this court has held that broad provisions to arbitrate all disputes arising out of or relating to the overall contract, like the one at issue here, do not provide the requisite clear and unmistakable evidence 'within the four corners of the . . . [a]greement that the parties intended to submit the question of whether an agreement to arbitrate exists to an arbitrator.'")

is governed by § 2 of the FAA, which provides that it shall be valid save upon grounds as exist at law or equity for the revocation of any contract.[38]  Those grounds do not include that the lack of validity must be "clear and unmistakable," and "they are not grounds that *First Options* added for agreements to arbitrate gateway issues; § 2 applies to all written agreements to arbitrate."[39]

Here, there was no clause containing delegation of arbitrability to the arbitrator.  There is no "clear and unmistakable" language that the gateway issue of arbitrability is to go to an arbitrator.  Thus, the Court properly considers whether the claims at issue should be decided by the arbitrator.  However, the issue of whether the agreement is invalid because it was fraudulently induced is not subject to the "clear and unmistakable" language standard provided by the Supreme Court.  Therefore, the presumption of arbitrability applies—any doubts concerning arbitrability of a dispute should be resolved in favor of arbitration.[40]  As will be discussed more fully below, the arbitration clause at issue is broad with the language "arising from or in connection with" the maintenance performed under the agreements.  The Court finds that the arbitration clause is broad enough in scope to encompass Plaintiff's claim that the contract for maintenance of the engines was induced by fraud.  Therefore, this Court does not reach a decision on the merits of Plaintiff's fraudulent inducement claim as it must be decided by the arbitrator.

## 2.     Unconscionability

Alternatively, Dodson argues that the contracts including the arbitration clauses are unenforceable because they are unconscionable under the Kansas Supreme Court standards, the Kansas Consumer Protection Act ("KCPA"), and the Kansas Unfair Trade Practices Act

---

[38] *Rent-A-Center, West, Inc.*, 561 U.S. at 69 n.1.

[39] *Id.*

[40] *LDS, Inc. v. Metro Can. Logistics, Inc.*, 28 F. Supp. 2d 1297, 1299 (D. Kan. 1998).

("KUTPA").[41]  Specifically, Dodson contends there was no negotiation between the parties and Williams refused to provide services until the contracts were signed.

While it is unclear whether Plaintiff's unconscionability argument relates to the arbitration clause alone or the contract as a whole, in an abundance of caution, the Court finds that the argument can be construed as relating only to the arbitration clause being unconscionable.[42]  Thus, under the rule articulated by the Supreme Court in *Prima Paint*, a claim relating to the arbitration clause alone must be resolved by the Court.  The Court must apply Kansas substantive law on the unconscionability of the arbitration clauses in the agreements between the parties.

First, the unconscionability provision that applies to the KCPA is inapplicable.  This provision states: "[n]o supplier shall engage in any unconscionable act or practice in connection with a *consumer* transaction."[43]  Consumer is defined within the KCPA as "an individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property or services for person, family, household, business or agricultural purposes."[44]  Dodson is a "corporation organized for profit under the Laws of Kansas."[45] Thus, because Dodson is a corporation, this provision is inapplicable.

Next, the Court finds that the arbitration provisions in the agreements are not unconscionable under the standards announced by the Kansas Supreme Court.  It is the policy of Kansas law to permit "mentally competent parties to arrange their own contracts and fashion

---

[41] K.S.A. § 50-623, *et seq.*

[42] Doc. 14 at 11 ("An additional reason that the *arbitration provisions* are un-enforceable is that they are unconscionable under the standards of the Kansas Supreme Court . . . and under the standards of the KUTPA and KCPA." (emphasis added)).

[43] K.S.A. § 50-627(a).

[44] K.S.A. § 50-624(b).

[45] Doc. 1 ¶ 4.

their own remedies where no fraud or overreaching is practiced."[46]  "Contracts freely arrived at and fairly made are favorites of the law."[47]  The Court will uphold contracts provided they are neither "illegal nor contrary to public policy, and that in the absence of fraud, mistake or duress a party who fairly and voluntarily entered into such a contract is bound thereby notwithstanding it was unwise or disadvantageous to the complaining party."[48]

Unconscionability is a doctrine under which a contract may be denied enforcement because of "procedural abuses arising out of the contract formation, or because of substantive abuses relating to the terms of the contract, such as terms which violate reasonable expectations of parties or which involve gross disparities in price."[49]  The burden of establishing unconscionability is on the party attacking the contract.[50]  That party must show unconscionability "at the inception of the contract rather than in the light of subsequent events."[51]

The leading case on unconscionability in Kansas is *Willie v. Southwestern Bell Telephone Co.*[52]  In *Willie*, the Kansas Supreme Court found the following factors relevant to whether a contract was unconscionable:

> (1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position;
> (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights

---

[46] *Estate of Bryant v. All Temperature Insulation, Inc., et. al* ., 916 P.2d 1294, 1298 (Kan. Ct. App.1996) (quoting *Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.,* 535 P.2d 419, 424 (Kan. 1975)).

[47] *Id.* (quoting *Kansas City Structural Steel Co.*, 535 P.2d at 424).

[48] *Knopke v. Ford Motors Co.*, No. 14-2225, 2014 WL 5817326, at *4 (D. Kan. Nov. 10, 2014) (quoting *Willie v. Sw. Bell Tele. Co.*, 549 P.2d 903, 905 (Kan. 1976)).

[49] *Wilson v. Mike Stevens Motors, Inc.*, 111 P.3d 1076, 1076 (Kan. Ct. App. 2005) (quoting *Remco Enters. Inc., v. Houston*, 677 P.2d 567, 572 (Kan. 1984)).

[50] *Santana v. Olguin*, 208 P.3d 328, 332 (Kan. Ct. App. 2009).

[51] *Knopke*, 2014 WL 5817326, at *4.

[52] 549 P.2d 903 (Kan. 1976).

and remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power.[53]

Further, there must be additional factors such as deceptive bargaining conduct as well as unequal bargaining power to render the contract unconscionable.[54]

Here, Plaintiff argues that factors 1, 5, 8, and 10 weigh in favor of finding unconscionability of the arbitration provisions. Plaintiff offers that there was no negotiation, Defendant prepared the authorizations including the arbitration provision, and Plaintiff never signed either authorization. Plaintiff states that Defendant simply emailed the document to Plaintiff in Kansas and indicated that no work would be commenced until the authorizations were signed and invoices prepaid. Plaintiff claims that the only available option for obtaining an airworthiness determination for the engines was to sign the authorizations.

The Court does not find that Plaintiff has met its burden to show that the arbitration provisions are unconscionable. Plaintiff is a corporation that has been engaged in the aircraft purchase business for more than thirty years. Plaintiff is much more sophisticated than a consumer, which is where unconscionability of a contract is normally found.[55] The arbitration provision at issue is displayed on the front of the quotation where Plaintiff's representative

---

[53] *Id.* at 906–07 (citations omitted).

[54] *Id.* at 907.

[55] *See, e.g., Ed Bozarth Chevrolet, Inc. v. Black*, 96 P.3d 272, 279 (Kan. Ct. App. 2003) ("An adhesion contract is a '[s]tandardized contract form offered to consumers of goods and services on an essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract." (quoting *Anderson v. Union Pac. R.R. Co.*, 790 P.2d 438 (Kan. Ct. App. 1990)).

signed.[56]  It is listed as one of only nine terms and conditions of the quotation.  It is not hidden or

in fine print.  The phrasing of the clause is comprehensible, and it would certainly be

comprehensible to a representative of a sophisticated corporate entity.  There is no evidence in

the record that Plaintiff objected to, inquired about, or attempted to negotiate the arbitration

provision.  Both parties are established businesses in the aircraft industry, so the Court does not

find it persuasive that there is a large inequality in bargaining or economic power between the

parties such that the arbitration provisions should be found unconscionable.

Further, the arbitration provisions are not unduly one-sided.  Arbitration provisions,

particularly in business-to-business contracts, are relatively common.  There is nothing unusual

about the arbitration provisions in the contracts between these parties.  The arbitration provision

requires that any dispute with the maintenance provided be submitted to a neutral arbitrator in

the location Defendant provides.  Simply because Defendant provides the location of arbitration

does not make this provision unduly one-sided.   Based on the aforementioned reasoning, the

Court finds that Plaintiff has not met its burden to present evidence that the arbitration clauses

are unconscionable.

Although the Court is cognizant of Plaintiff's argument that it had no choice on whether

to use Defendant to evaluate and repair the engines and in turn, sign the contracts, the Court does

not believe this implicates the validity of the arbitration provisions.  Regardless of whether the

contract itself is unconscionable, standard arbitration provisions are to be expected in business-

to-business transactions.  While the Court does not find unconscionability as to the arbitration

provisions, Plaintiff may submit the unconscionability of the contracts as a whole to arbitration

---

[56] Doc. 10-1 at 8, 10.

under the standard announced in *Prima Paint*.  The Court makes no findings as to the

unconscionability of the agreements as a whole.

### B.    Scope of the Arbitration Clauses

Dodson's second argument against compelling arbitration is that even if the Court finds

that the contracts are enforceable, these are narrow arbitration clauses and the claims alleged fall

outside of its scope.  To determine whether a dispute falls within the scope of an agreement's

arbitration clause, the Tenth Circuit has adopted a three-part inquiry.[57]

> First, recognizing there is some range in the breadth of arbitration clauses, a court
> should classify the particular clause as either broad or narrow.  Next, if reviewing
> a narrow clause, the court must determine whether the dispute is over an issue that
> is on its face within the purview of the clause, or over a collateral issue that is
> somehow connected to the main agreement that contains the arbitration clause.
> *Where the arbitration clause is narrow, a collateral matter will generally be ruled*
> *beyond its purview.*  Where the arbitration clause is broad, there arises a
> presumption of arbitrability and arbitration of even a collateral matter will be
> ordered if the claim alleged implicates issues of contract construction or the
> parties' rights and obligations under it.[58]

Applying the first step, the Court agrees with Williams that this is a broad arbitration

clause.  Many courts, including the Tenth Circuit, have concluded that an arbitration clause

applying to disputes "arising under" or "in connection with" the agreement constitute broad

arbitration clauses.[59]  Therefore, there is a presumption of arbitrability and even collateral

---

[57] *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005) (citing *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)).

[58] *Sanchez v. Nitro-Lift Techs., LLC*, 762 F.3d 1139, 1146 (10th Cir. 2014) (citing *Cummings*, 404 F.3d at 1261).

[59] *See, e.g., Brown v. Coleman Co.,* 220 F.3d 1180, 1184 (10th Cir. 2000) (explaining that arbitration clause stating "all disputes or controversies arising under or in connection with this Agreement . . . will be settled exclusively by arbitration" was "the very definition of a broad arbitration clause" (omission in original)); *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) (stating that arbitration clause covering "[a]ny controversy, claim, or breach *arising out of or relating* to this Agreement . . . is a 'broad' one"); *Louis Dreyfus,* 252 F.3d at 225–27 (noting that phrase "[a]ny dispute arising from the making, performance or termination of this [agreement]," while containing limiting language, was "a broad arbitration clause"); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.,* 58 F.3d 16, 20 (2d Cir.1995) (explaining that phrase " '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause"); *Himark Biogas, Inc. v. W. Plains Energy LLC,* No. 14-1070, 2014 WL 3519092, at *5(D. Kan. July 16, 2014) ("The court's conclusion that these claims come within

matters may be swept in the clauses' purview.  The arbitration clause at issue in this case reads that "[a]ll disputes *arising from or in connection with* maintenance performed by Williams International shall be submitted to binding arbitration."[60]  The language "arising from" or "in connection with," indicates that it is a broad arbitration clause.

Upon concluding this is a broad arbitration clause, the Court presumes arbitrability even as to collateral matters related to maintenance performed by Williams.  The Court finds that all counts alleged in the Complaint fall within the sweep of the arbitration clause.  Count I is for intentional misrepresentation relating to Williams's representations regarding the evaluation of the engines and the cost of repair and return to service, which clearly relates to the maintenance performed.  Count II is for breach of bailment and conversion relating to Williams keeping the engines and component parts when the engines could not be repaired.  This is directly related to the contracts at issue.

Count III is a federal antitrust claim of an unlawful "tying" arrangement relating to owners of Williams's engines being required to service and repair the engines through Williams. This is collateral to the maintenance herein disputed, but it is the exact conduct Dodson complains caused Williams to fail to repair its engines in this case.  Although this claim expands beyond conduct between these two parties, it relates directly to the business practices Dodson complains happened in its experience with Williams.[61]  Count IV is another federal antitrust claim relating to William's monopoly over replacement parts, engine repairs, and engine

---

the scope of the arbitration clause is consistent with the Tenth Circuit's holding that the phrase, 'arising out of or relating to,' such as is found in the Licensing Agreement, is a broad arbitration clause.").

   [60] Doc. 10-1 at 8, 10.

   [61] *In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1201–02 (10th Cir. 2016) (holding that antitrust claim fell within scope of arbitration agreement, even though claims arose from events prior to the arbitration agreement, because arbitration agreement stated that parties agreed to arbitrate "any and all claims or disputes" that "arise out of or in any way relate to" agreement, services, products or bills).

overhauls making repairable parts unserviceable.  Again, although it is a collateral matter, it relates to the conduct Dodson complains caused Williams to fail to fix its engines.

Count V and Count VI are for tortious interference with prospective economic advance and tortious interference with contract relating to Plaintiff's plan to sell the engines following repair to a third party, which was prevented when Williams could not repair the engines.  This is directly related to the maintenance, or in this case lack of maintenance, provided by Williams. Count VII is for declaratory judgment for Dodson to seek access to Williams's proprietary technical data to presumably allow Dodson to repair the engines Williams refused to repair.  This is collateral to the contracts at issue as Williams has the information Dodson seeks based on the evaluation and repair conducted pursuant to the contract.  Further, as discussed above, fraud in the inducement of the maintenance contract would be a matter collateral to the maintenance contract.

The Court agrees with Williams that Counts I, II, V, and VI are directly related to the maintenance agreements in dispute, and Counts III, IV, and VII are collateral to the maintenance agreement but still "arising from or in connection with" the maintenance performed (or in this case, allegedly failed to be performed) by Williams.  Further, the Court finds that the fraud in the inducement claim relating to the creation of the agreement falls within the scope of the arbitration clause.  While Plaintiff has requested that Counts II–VII be bifurcated from arbitration as collateral, the Court denies this request because this is a broad arbitration clause that covers such collateral matters.  Therefore, the Court concludes that the arbitration provisions are properly enforced and the claims should be submitted to arbitration.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Williams' Motion to Compel Arbitration (Doc. 10) is **granted**.

**IT IS FURTHER ORDERED** that this action is stayed pending arbitration.

**IT IS FURTHER ORDERED** that Plaintiff Dodson and Defendant Williams are to proceed with arbitration in accordance with the provisions of the arbitration clause.

**IT IS FURTHER ORDERED** that if this case is still pending on June 1, 2017, the parties shall file a joint status report on June 1, 2017 apprising the Court of the status of the proceedings.

**IT IS SO ORDERED.**

Dated: January 31, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE